UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

COLSON JEAN-LOUIS, SHANORI KNIBBS,
SHANE MORRIS, AHMED MASSEY, ERIC
PENA, JESUS PEREZ, TASHAN RODNEY,
KASEEM WILSON, JOHN WHICHARD,
TYRONE WILLIAMS, TYRIK STYLES,
KAREEM HAYWARD, FARLEEK HOPKINS,
RICARDO JACQUET, OSVALDO AGOSTO,
BENJAMIN BANKS, BEVION BLAINE, ANDY
BORGELLA and SANTINO BODRICK,

**FIRST AMENDED
COMPLAINT**

Jury Trial Demanded


No. 16 Civ. 5275 (PKC)

                              Plaintiffs,

              -against-

CITY OF NEW YORK, CORRECTIONS
CAPTAIN SANDY ARKHURST, #570,
CORRECTIONS CAPTAIN CHANELE
HENRY, #978, CORRECTIONS CAPTAIN
HERNS MITTON, CORRECTIONS CAPTAIN
DARRON FREDERICK, #1387,
CORRECTIONS ADW SHERMA DUNBAR,
#1041, CORRECTIONS ADW JULIO COLON,
#1307, CORRECTIONS CAPTAIN NATASHA
PETTY, #1626, CORRECTIONS CAPTAIN
CARTER, CORRECTIONS CAPTAIN ROBERT
SANTANA, CORRECTIONS OFFICER ABEL,
#1177, and JOHN AND JANE DOE
CORRECTIONS OFFICERS 1-15,

                              Defendants.

---------------------------------------------------------------- x

## NATURE OF THE ACTION

1.      This is an action to recover money damages arising out of the violation of Plaintiffs' rights under the Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.

3.      This Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343.

4.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## JURY DEMAND

5.      Plaintiffs demand a trial by jury in this action pursuant to Federal Rule of Civil Procedure ("FRCP") 38.

## PARTIES

6.      Plaintiffs Colson Jean-Louis, Shanori Knibbs, Shane Morris, Ahmed Massey, Eric Pena, Jesus Perez, Tashan Rodney, Kaseem Wilson, John Whichard, Tyrone Williams, Tyrik Styles, Kareen Hayward, Farleek Hopkins, Ricardo Jacquet, Osvaldo Agosto, Benjamin Banks, Bevion Blaine, Andy Borgella, and Santino Bodrick

were in custody of the New York City Department of Corrections at Rikers Island at the time of the incident discussed in this Complaint.  They were in housing for pretrial detainees.

7.     Defendant City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

8.     Defendant City of New York maintains the New York City Department of Corrections (hereinafter "NYDOC"), a duly authorized public authority and/or corrections department, authorized to perform all functions of a corrections department as per the applicable sections of the aforementioned municipal corporation, the City of New York.

9.     Defendant Captain Sandy Arkhurst, #570, Defendant Captain Chanele Henry, #978, Defendant Captain Herns Mitton, Defendant Captain Darron Frederick, #1387, Defendant ADW Sherma Dunbar, #1041, Defendant ADW Julio Colon, #1307, Defendant Captain Natasha Petty, #1626, Defendant Captain Carter, Defendant Captain Robert Santana, Defendant Officer Abel, #1177, and John/Jane Doe Corrections Officers 1-15, at all times relevant herein, were duly sworn officers, employees and agents of the DOC and were acting under the supervision of said department and according to their official duties.  They are sued in their individual capacities.

10.     That at all times hereinafter mentioned Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State of New York and/or the City of New York.

11.     Each and all of the acts of the Individual Defendants were done by said Defendants while acting within the scope of their employment by Defendant City of New York.

## STATEMENT OF FACTS

12.     On or about May 21, 2015, Plaintiffs were incarcerated at Rikers Island at the Anna M. Kross Center ("AMKC").  All Plaintiffs were in the same Housing Unit.

13.     Earlier that week, Corrections Officers had placed the Plaintiffs' AMKC Housing Unit on lockdown because they believed that an inmate there allegedly possessed a cellular telephone.  At no time did they suspect or have any reason to suspect that any one of the Plaintiffs in this action possessed the item or was involved.

14.     There were roughly thirty cells in the Housing Unit and the Corrections Officers had already subjected Plaintiffs to repeated cell and strip and body searches throughout the lockdown.  Half of the cells (fifteen) were on one side of the Housing Unit and faced the other half of the cells on the other side.  One inmate resided in

each one of the cells.

15.     Despite the Corrections Officers' repeated indiscriminate searches, the Corrections Officers were unable to find the alleged telephone.   They remained without suspicion or reason to suspect that Plaintiff was involved.

16.     On or around May 21, 2015, Doe Defendant Corrections Officers arrived in the Housing Unit and announced that they were going to conduct another search for the phone.   Doe Defendant Corrections Officers had dogs and MK-9, a kind of pepper spray. Among the Doe Defendant Corrections Officers were members of the Emergency Security Unit ("ESU").

17.     On information and belief, Defendant ADW Dunbar, Defendant ADW Colon, Defendant Captain Mitton and Defendant Captain Frederick knew about the May 21, 2015 search plan, either because they developed it or approved it (hereinafter the "Authorizing Defendants").   The Authorizing Defendants did this even while knowing that the plan entailed the use of force against Plaintiffs which was not justified by any individualized reason and which was not likely to further the institution's interest in finding the telephone.

18.     On information and belief, Defendants began their May 21, 2015, search with Plaintiff Mr. Borgella's cell in the Housing Unit.

19.     On information and belief, Defendant Captain Arkhurst, Defendant Captain Henry, Defendant Captain Frederick, Defendant Captain Mitton, Defendant

Captain Carter and Defendant Captain Santana participated in the uses of force against all Plaintiffs alleged in this litigation.

20.     Without Mr. Borgella providing Defendants with any justification for doing so, Defendants sprayed MK-9 into Mr. Borgella's cell; handcuffed him; sprayed him again; beat him and dragged him out of the cell.

21.     Plaintiffs and all other inmates could hear commotion as Mr. Borgella and other inmates in those first cells were sprayed and dragged out of their cells.  On information and belief, all of this was ostensibly done in order to search the cells, but on information and belief, Defendants did not search the cells.

22.     Doe Defendants thereafter worked their way through the Housing Unit cell-by-cell.  Each one of the Plaintiffs could hear Defendants spraying and striking other inmates as Defendants approached.

23.     On information and belief, the Defendants conducted the cell searches in two teams, with each team handling the fifteen cells on one side of the Housing Unit.

24.     On information and belief, three or four Defendants entered each cell to physically drag out its occupant.

25.     By the time Defendants reached each Plaintiff's cell, the Plaintiff had already begun to feel the effects of MK-9 in the air and was afraid of what he supposed would be certain assault.

26.     Plaintiffs' only possible defense against being assaulted was to communicate total compliance with Defendants' orders and hope for mercy. Depending on the Plaintiff, this total compliance might have included verbal assurances, a submissive posture, etc.  Plaintiffs attempted to so protect themselves.

27.     Despite the Plaintiffs' manifestations of submission and compliance, Defendants sprayed, handcuffed, used force against and dragged every inmate in the Housing Unit.

28.     Plaintiffs suffered many different injuries as a result of the Defendants' force.  These injuries, detailed below, include but are not limited to, vomiting, coughing, crying, bruising, blurry vision, dermatological problems, cuts, abrasions and fractures.

29.     Defendants transported the injured Plaintiffs and other inmates from the Housing Unit to "intake," an area at AMKC where inmates are processed for discipline.  Plaintiffs estimate that this transport by itself, due to the volume of inmates affected who also had to be transported, took roughly an hour, during which time they were in pain and suffered great burning and itching to their skin and eyes as a consequence of the chemical assault.

30.     In intake, a DOC investigative team took photographs of Plaintiffs' injuries.

31.     Defendants were deliberately indifferent to Plaintiffs' serious medical

needs caused by Defendants' own assault, placing Plaintiffs at substantial risk of serious physical injury due.  For example, Defendants had three members of medical personnel in intake in order to help complete perfunctory "inmate injury" reports with the help of Corrections Officers such as Defendant Corrections Officer Abel, #1177.

32.     Defendant Abel filled out the reports in boilerplate fashion in order to create documents that minimized the effects of other Defendants' use of force.  On information and belief, Defendant Abel did this knowing that Defendants violated Plaintiffs' rights and while indicating on the forms that he s/he had not personally observed whether and to what extent the subject Plaintiffs had injuries.

33.     Defendants did not permit Plaintiffs to properly treat the MK-9 exposures despite the fact that the chemicals continued to aggravate their eyes and skin a fact which, for certain Plaintiffs, would have more serious effects (glasses, dermatological treatments) than others.  At best Defendants permitted certain Plaintiffs to shower with water only to clean off the MK-9 while in intake.  For still other Plaintiffs, Defendants only permitted them containers of water and/or another liquid which may have been milk to daub the MK-9 off of their bodies as best they could.

34.     Plaintiffs were in intake for various periods of time with the most being roughly one day.  While in intake, Plaintiffs protested the Defendants' use of force

against the collective population of the Housing Unit.  From intake Plaintiffs were taken back to the Housing Unit or they were transferred to punitive segregation and/or another facility.  On information and belief, on hearing Plaintiffs' complaints, Defendants split Plaintiffs apart and transferred them in this fashion in an effort to thwart Plaintiffs from developing a collective complaint seeking redress for Defendants' violation of all Housing Unit residents' rights. Certain documents in Plaintiffs' possession – for example, documents relating to transfer—state that the reason for a Plaintiff's transfer to "pre-hearing detention" was because force had been used upon the Plaintiff (as opposed to being motivated by Plaintiff's own alleged misconduct).

35.    Defendants put certain Plaintiffs—on information and belief, approximately ten—in solitary confinement despite the fact that Defendants had no particularized information making it likely to believe that those Plaintiffs or, on information and belief, any of the inmates in the Housing Unit, had possessed the alleged cellular telephone.

36.    On information and belief Defendants never found the alleged telephone.  It is certain that Defendants did not find the alleged phone or any contraband in Plaintiff's cell and, on information and belief, Defendants never alleged that they did.

37.    Defendants' placement of Plaintiffs in solitary confinement occurred

without first issuing them infraction reports let alone providing them with a hearing where he was able to defend himself with the benefit of due process.  When the segregated Plaintiffs did learn that they had been infracted, the infractions brought false claims that the Plaintiffs had rioted, failed to obey orders and created safety/health hazards.  This was not true.

38.    On information and belief, Defendants held roughly ten of the inmates from the Housing Unit affected by the incident in punitive segregation.  Again, other Plaintiffs and inmates were taken back to the Housing Unit while still others were transferred to another facility.

39.    Defendants held segregated Plaintiffs in solitary confinement for roughly two weeks during which his access to food, recreation, hygiene, social interaction, space, programming and more were restricted and during which time Plaintiff never received a hearing or notice that one would be held.

40.    In the immediate aftermath of the incident, Plaintiffs did not receive medical treatment beyond what is described herein.

41.    All Plaintiffs in this action had similar experiences to the one described above insofar as they all suffered Defendants' indiscriminate assault upon inmates in that Housing Unit.  Defendants' acts were, as to all Plaintiffs, without any information and/or justification vis-à-vis any one individual.  For example, Defendants wrote use-of-force reports after the fact that applied to all inmates; failed to name the individual

inmates against whom force was used; and in some instances, the reports even said that Defendants had not identified all inmates against whom they had used force.

42.    Even if Defendants had acted in the above-described manner as to any one Plaintiff inmate with an articulable reason to believe that that individual might have the contraband cellular telephone, which they did not, Defendants' acts were not tailored to the goal of retrieving that contraband cellular telephone.

43.    While some Plaintiffs suffered what might be called "garden variety" damages as a result of the MK-9's effects upon their eyes and skin, other Plaintiffs suffered unique damages specific to their experience.    Some of these individual damages are alleged in greater detail below.

44.    Defendants' own documentation of the Plaintiffs' injuries was incomplete.    Defendants appear to have largely used a boilerplate "injury to inmate report" to record the injuries that Plaintiffs suffered, without regard to what injuries Plaintiffs actually suffered.    For example, the same text is used on many Plaintiffs' injury reports, and Defendant Corrections Officer Abel, #1177, who filled out a great many of these, never actually witnessed any of the injuries, yet he wrote that the injuries were not visible.    He also noted, correctly, that none of the Plaintiffs refused medical attention.    In fact most Plaintiffs requested medical attention but Defendants refused it to them.

45.    On information and belief, with the exception of Mr. Jean-Louis, all

Plaintiffs filed Notices of Claim within ninety days of the incident, thus preserving certain state claims.

46.     On information and belief, numerous Plaintiffs wrote to the Defendant City directly or through a representative within ninety days of the incident to request that the same preserve the video footage of the incident.  For example, this was true as to Mr. Whichard and Mr. Perez and, on information and belief, these grievances and requests to preserve were sent to the Deputy Commissioner for Integrity and Policy; the Board of Corrections and the Department of Corrections's Legal Department.

47.     On information and belief, an Inspector General's team investigated the incident in what at least one Plaintiff inmate recollects being identified as "Investigation No. 1860 of 2015 May."

48.     After the incident, as already noted, certain Plaintiffs were falsely infracted and sent to punitive segregation.  On information and belief, this was to cover up that Defendants used excessive force indiscriminately on the inmates (and also to keep the inmates in the Housing Unit from discussing what had occurred and planning to collectively seek redress).

**Plaintiffs' Damages**

49.     Certain Individual Plaintiffs suffered asthma complications (Knibbs, Pena, Massey, Perez, Blaine), blurry vision (Jean-Louis, Knibbs, Hayward, Perez,

Hopkins), bloody mucous (Wilson), longer-term dermatological irritation requiring medical treatment (Morris, Pena, Banks, Blaine), cracked wrist bone (Knibbs), a broken tooth (Agosto), a broken pinky finger (Agosto), blood in urine (Borgella), a closed arm fracture (Jacquet), a re-broken jaw that had been successfully set with a metal plate (Styles), cuts and/or numbness and swelling from too-tight plastic flexi-cuffs handcuffs (Wilson, Pena, Morris, Styles, Hayward), abrasions/cuts/bruises (Wilson (bucket to the head), Morris (stomped about his neck and back, and punched in the eye), Massey (bruise to forehead and split lip), Whichard (bruises on face, wrist and neck), Perez (bruise in a ring shape around his neck from a Defendants' hands), Williams (bruise on the face), Styles (swollen eye and cut on inner cheek), Hayward (bruise to the back of the head, to his face and lower back pain)), Hopkins (re-injured back), Jacquet (lacerated knee), Banks (sprained back and bumps on head), Jean-Louis (back and leg bruises)) and more.

50.     On information and belief, only some of these Individual Plaintiffs—roughly ten—were "infracted" and these were chosen at random in order to justify the mass spraying and other misconduct. The Individual Plaintiffs who were infracted were falsely infracted, charged with rioting, causing a safety/health hazard, and failure to obey orders. However, none of these charges were made with any individual, articulable reason to believe that a specific Plaintiff had committed the infraction.

51.     On information and belief, the following Plaintiffs were falsely infracted

as described above and sent through a disciplinary process devoid of due process as described above: Mr. Jean-Louis, Mr. Knibbs, Mr. Pena, Mr. Whichard, Mr. Blaine and Mr. Banks.

52.     On information and belief, the following Plaintiffs were <u>not</u> subject to the false infraction and due-process-less disciplinary produre: Mr. Wilson, Mr. Morris, Mr. Rodney, Mr. Williams, Mr. Styles, Mr. Hayward, Mr. Hopkins, Mr. Agosto, Mr. Borgella, Mr. Bodrick and Mr. Jacquet.

53.     Certain Plaintiffs—for example, Mr. Styles—allege that although they were never the subject of an infraction and never received a hearing, Defendants ordered them held in punitive segregation for roughly thirteen days.

54.     In addition to the foregoing, all Plaintiffs' personal belongings, including their legal papers, were sprayed with MK-9, either ruining the items in the process or greatly complicating Plaintiffs' ability to access them.

**Defendants' Personal Involvement**

55.     Captain Shannon, #1628, who is not a Defendant, was assigned to preside over at least Mr. Knibbs's, Mr. Pena's and Mr. Blaine's disciplinary hearings and, on information and belief, dismissed the infraction reports due to the fact that the "details of [the] incident [were] vague." Of course, by that time, Mr. Knibbs, Mr. Pena and Mr. Blaine had already spent nearly two weeks in punitive segregation due to the false infraction written against them by Defendant Captain Henry, #978, among

others, as described above.

56.    On the subject of the dismissed charges, Captain Shannon partially identified their deficiencies, remarking that they might be properly re-drawn by identifying staff who witnessed the inmate misconduct and providing supporting documentation.

57.    Defendant ADW Colon, # 1307, Defendant Captain Henry, Defendant Captain Arkhurst, #570, and Defendant Captain Mitton, among others, were personally involved with other Doe Defendants in the use of force upon Plaintiffs in the Housing Unit which led to Plaintiffs' injuries and this litigation.  These Individual Defendants' names appear on paperwork collected by Plaintiffs.

58.    On information and belief, Defendant Captain Frederick, Defendant Captain Carter and Defendant Captain Santana were also personally involved in the May 21, 2015, search and force.  This is at the recollection of certain Plaintiffs.

59.    In contrast to Captain Shannon's actions vis-à-vis Mr. Knibbs' and Mr. Pena's infraction report, other Defendants took a different approach which was unlawful and failed to consider due process protections.  If should be noted that the punitive segregation that certain Plaintiffs endured was suffered at a time when they had not received sufficient medical attention to address injuries caused by the use of force upon them.  Thus, these Plaintiffs' day-to-day experience as an incarcerated person was very different than simply receiving less space, food, recreation, exercise,

social interactions, programming, library and other facility access, etc.  In addition to those already significant deprivations, Plaintiffs had to endure them while suffering the painful and/or uncomfortable effects of unaddressed symptoms arising from the force.

60.     Defendant Captain Petty, #1626, on the basis of the same allegations that Captain Shannon found too vague, found Plaintiff Mr. Massey, Mr. Wilson, Mr. Whichard, guilty of failing to obey an order and also creating safety/health hazards. The allegations did not support such a finding and if Defendants failed to provide Captain Shannon with supporting documentary evidence relating to the charges, it stands to reason that Defendants failed to provide Defendant Captain Petty with such evidence.  Plaintiffs deny that any such evidence could exist.

61.     Defendant Captain Frederick, #1387, and Defendant Assistant Deputy Warden Dunbar, #1041, were both personally involved in transferring certain Plaintiffs to punitive segregation pending the disciplinary hearing relating to the false and insufficient infraction report.  On information and belief, Defendant Captain Frederick and Defendant ADW Dunbar knew at the time of the transfer to punitive segregation that Defendants had fabricated an infraction to justify the unlawful indiscriminate use of force upon Plaintiffs and personally participated and/or failed to intervene to stop it.  For example, when Captain Shannon saw the infraction as described, he called it too vague, yet Captain Frederick and ADW Dunbar permitted

Plaintiffs to be sent to punitive segregation on the same basis.

62.     On information and belief, Defendant Captain Frederick and Defendant ADW Dunbar, in acting to transfer a large group of Plaintiffs to another location, intended to thwart Plaintiffs from seeking redress for the violations of their rights by discussing amongst each other what had occurred and considering what administrative action they might take to obtain help.

63.     All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of New York, including, without limitation, the inadequate screening, hiring, retaining, training and supervising of its employees. This inadequate screening, hiring, retaining, training and supervising of its employees, as demonstrated in the instant case, results in incidents during which Corrections Officers such as Individual Defendants in this case, act without regard for or knowledge of individuals' constitutional rights in their performance of their duties.

64.     Plaintiffs' injuries are not the result of an isolated incident.  Indeed, as this Complaint alleges, Plaintiffs were just some of many inmates who suffered similar injuries that day.  This fact—the repeated violations of individuals' constitutional rights all around Plaintiffs in the same manner as Plaintiffs' own were violated—supports the allegation of the City's insufficient screening, hiring, retaining, training and supervising of its applicants and actual COs.

65.     On information and belief, this incident of indiscriminate constitutional violations as a means to finding contraband is not an outlier event.   The allegation that it may be a recurring problem which adequate screening, training and discipline may address may be inferred again, from the fact that the mass violations here appeared not to have given Individual Defendants here any observed pause.

66.     In addition, the fact that it may be a recurring problem is evidenced in recent news reports about legal actions addressing and reports studying DOC's employees' violation of rights in other contexts.   These rights violations include, but are not limited to, the unequal application of rules to LGBT prisoners, inadequate medical care for serious medical needs, and excessive use of force against juvenile prisoners.   In each of these contexts, as in the context of the violations Plaintiffs suffered here, it stands to reason that the City's dedication of resources to training, supervision and discipline would aid in preventing such abuses in the first instance. See, e.g., Lambda Legal, Lambda Legal Joins Federal Lawsuit After Anti-Gay Attack at Rikers Island, Oct. 29, 2015, at

http://www.lambdalegal.org/blog/20151029_antigay-attack-rikers-island   (describing DOC officers' refusal to permit a hug and a kiss between men despite the agency's general visitation policy permitting such demonstrations of affection) (last accessed July 2, 2016); Gary Hunter, Abysmal Medical Care at Rikers Island, Prison Legal News, July 7, 2015, at

https://www.prisonlegalnews.org/news/2015/jul/7/deep-seated-culture-violence-and-abysmal-medical-care-rikers-island/ (discussing various examples of Rikers inmates dying and/or suffering severe physical injury as a result of officer indifference) (last accessed July 2, 2016); Feds to Oversee Reforms at New York's Rikers Island Jail Complex, at

http://america.aljazeera.com/articles/2015/6/19/monitor-to-oversee-reforms-at-rikers-island.html (discussing a settlement between the U.S. DOJ and the NYC DOC permitting a federal monitor to oversee Rikers' treatment of juvenile detainees in the aftermath of a federal study showing the use of routine excessive force against the department's juvenile charges) (last accessed July 2, 2016); Reuven Blau and Dareh Gregorian, Rikers Island's Cycle Of Violence Violates Teen Inmates' Constitutional Rights: DOJ, New York Daily News, Aug. 4, 2014, at

http://www.nydailynews.com/new-york/rikers-island-cycle-violence-violates-teen-inmates-constitutional-rights-doj-article-1.1891302 (last accessed July 2, 2016) (discussing SDNY USAO report criticizing the fact that DOC employees routinely wrongfully beat adolescent prisoners when they step "even an inch out of line");

67.    Defendant City of New York is thus aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional rights.  Despite such notice, Defendant City of New York has failed to take corrective

action.  This failure caused Individual Defendants in this case to violate Plaintiffs' constitutional rights.

68.    Moreover, on information and belief, Defendant City of New York was aware, prior to the incident, that the Individual Defendants lacked the objectivity, temperament, maturity, discretion and disposition to be employed as corrections officers.  Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train and supervise them.

69.    All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

70.    All of the aforementioned acts deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

71.    The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as corrections officers, with the entire actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYC DOC, under the supervision of ranking officers of said department.

72.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

73.     As a result of the foregoing, Plaintiffs are entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## FIRST CLAIM
## 42 U.S.C. § 1983

74.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

75.     Defendants, by their conduct toward Plaintiffs alleged herein, violated Plaintiff's rights guaranteed by 42 U.S.C. § 1983, the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.

76.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

77.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## SECOND CLAIM
## EXCESSIVE FORCE

78.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

79.     Defendants violated Plaintiffs' Fourth and Eighth Amendment rights because they used unjustifiable force against Plaintiffs, which was objectively sufficiently serious to support such a claim and because they had a sufficiently culpable subjective state of mind at the time.

80.     The fact that Defendants used such force indiscriminately upon a multitude of inmates in the Housing Unit with no articulable justification demonstrates their state of mind.  The fact that Defendants used such force upon Plaintiffs with no articulable justification demonstrates their state of mind.

81.     The incident was an unnecessary and wanton infliction of pain upon Plaintiffs.

82.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

83.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## THIRD CLAIM
## CRUEL AND UNUSUAL PUNISHMENT

84.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

85.     Defendants violated Plaintiffs' Eighth Amendment right to be free from cruel and unusual punishment.  Plaintiffs were pre-trial and/or pre-sentence.

86.     Defendants' actions against Plaintiffs were arbitrary in the same way that their actions against Plaintiffs' fellow inmates were arbitrary and not tailored as a reaction to any particularized threat or suspicion of wrongdoing.  In addition, even if Defendants were able to articulate some theory as to why Plaintiffs should have been the target of their search that day, Defendants' actions were disproportionately severe relative to the circumstances insofar as Plaintiffs had committed no infraction and posed no threat.

87.     Defendants inflicted cruel and unusual mental and emotional punishment upon Plaintiffs in that before their use of excessive force upon him, their use of excessive force upon other inmates in the housing unit placed him in a state of fear knowing that it would eventually be his turn as well.

88.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

89.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## FOURTH CLAIM
## DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

90.    Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

91.    The Individual Defendants were deliberately indifferent to the fact that their actions created substantial risk of serious injury to Plaintiffs.   In addition, Individual Defendants were aware that in the aftermath of their assault, particularly the chemical aspect of that assault, Plaintiffs were injured and that their failure to act or ineffectual action under those circumstances ignored his plight.   Defendants' conscious disregard to the serious harm that Plaintiffs had suffered also threatened to cause him even more substantial physical harm had the chemicals continued to damage Plaintiffs' eyes and skin or, in the case of other Plaintiffs, their individual injuries as described herein.

92.    Although it is true that in general a delay in providing medical treatment cannot by itself violate the Eighth Amendment, courts have held that an intentional delay in necessary medical care, amounting in effect to a form of punishment, is actionable.   Here, Plaintiffs allege more than mere delay.   They alleged intentional disregard for their need for medical care, not only with respect to the chemical assault,

but also with respect to their other physical injuries caused when Defendants assaulted and dragged them, which injuries were not duly examined until much later when non-Defendant government employees permitted Plaintiffs to have medical attention.

93.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

94.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## FIFTH CLAIM
## DUE PROCESS

95.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

96.     Individual Defendants also violated Plaintiffs' due process rights when they seized their persons and placed them in punitive segregation, where they then housed them for an extended period of time before disciplinary hearing.

97.     As described herein and as discovery will elaborate, Plaintiffs' punitive segregation was materially worse from their and other inmates' typical existence in custody in a variety of categories, i.e., food, recreation, socialization, visits, personal

hygiene, cell cleanliness, and more.   In addition, Plaintiffs endured this material decline in their custodial living situation while suffering the poorly treated aftereffects of the force, which included itching and burning from the chemicals, and more. Although Plaintiffs contends that the material decline in their custodial living conditions was alone a compromised protected interest pursuant to the due process clause, they also contend that this is made even clearer when combined with the poor medical care they received, causing the material decline in their custodial living conditions without process to be all the more painful and uncomfortable.

98.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

99.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

**SIXTH CLAIM**
**FIRST AMENDMENT RETALIATION**

100.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

101.     Defendants named in this litigation took action against Plaintiffs in order to prevent them from having the ability to seek redress for the rights violations they had suffered.   Incarcerated persons are already as a disadvantage in their ability to seek

redress by virtue of their being in custody.  Defendants here exploited their control over Plaintiffs to complicate this already-difficult situation by transferring them out of the facility where they might collaborate with fellow victims to take action; where they had access to learn information about Defendants' identities; and where they had clearer access to learn information about Defendants' superiors for the purposes of complaint.  Defendants took this action in response to Plaintiffs' complaints in intake about the way that they had been collectively treated.

102.   Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

103.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## SEVENTH CLAIM
## FAILURE TO INTERVENE

104.   Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

105.   Many of the Individual Defendants that this action seeks to identify and hold accountable actively participated in the aforementioned unlawful conduct.  In addition, this action seeks to identify Individual Defendants who plainly observed the

herein described unconstitutional conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

106.   Accordingly, Individual Defendants who failed to intervene violated the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

107.   Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

108.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## EIGHTH CLAIM
## MONELL CLAIM

109.   Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

110.   Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

111.   The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the DOC included, but were not limited to,

the inadequate screening, hiring, retaining, training and supervising of its employees that was the moving force behind the violation of Plaintiffs' rights as described herein. As a result of the failure of the Defendant City of New York to properly recruit, screen, train, discipline and supervise its officers, including the Individual Defendants, Defendant City of New York has tacitly authorized, ratified and has been deliberately indifferent to, the acts and conduct complained of herein.

112.   The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City of New York and the DOC constituted, inter alia, deliberate indifference to the safety, well-being and constitutional rights of Plaintiffs.

113.   The foregoing customs, polices, usages, practices, procedures and rules of Defendant City of New York and the DOC were the direct and proximate cause of the constitutional violations suffered by Plaintiffs as described herein.

## EIGHTH CLAIM
## STATE CLAIMS

114.   Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint as if fully set forth herein and with the same force and effect.

115.   As discussed above, within ninety (90) days of the May 21, 2015, incident having occurred, Plaintiffs filed timely Notices of Claim in order to preserve

their state constitutional claims pursuant to General Municipal Law and to attempt to settle them.

116.   Plaintiffs have complied with the necessary preconditions to preserve the claims.  The claims fall within the exception outlined in CPLR 1602.  The City of New York has failed to settle the claims.

117.   On the basis of the herein alleged facts, Plaintiffs allege that Defendants actions also violated Plaintiffs' rights under the New York State Constitution, including, but not limited to, Article I, Sections 5, 6, 8, and 12.

118.   Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the New York State Constitution.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiffs respectfully requests:

A. An order entering judgment for Plaintiffs against Defendants on each of their claims for relief;

B. Awards to Plaintiffs for compensatory damages against all Defendants, jointly and severally, for their violation of their First, Fourth, Fifth, Eighth and Fourteenth Amendment rights, and New York State constitutional rights

as well, the amount to be determined at jury trial, which Plaintiffs respectfully demand pursuant to FRCP 38;

C. Awards to Plaintiffs of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to the constitutional rights and welfare of Plaintiffs, the amount to be determined at jury trial, which Plaintiffs respectfully demands pursuant to FRCP 38;

D. Awards to Plaintiffs of costs, including reasonable attorneys' fees;

E. Such further relief as this Court deems just and proper.

DATED:      December 8, 2016
            New York, New York


_____/s_____
Ryan Lozar
305 Broadway, 10th Floor
New York, New York 10007
(310) 867-1562
ryanlozar@gmail.com

*Attorney for Plaintiffs*